**UNITED STATES of America**

v.

**Alfred ELLIOTT, Defendant.**

**No. 88 CR 645-1.**

United States District Court,
N.D. Illinois, E.D.

Aug. 23, 1989.

See also, 727 F.Supp. 1131.

Larry Rosenthal, Kristina Anderson, Asst. U.S. Attys., Chicago, Ill., for U.S.

Alfred Elliott, Overland Park, Kan., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The defendant, Alfred Elliott, has been convicted of, among other things, a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The government now seeks the forfeiture of the proceeds of Elliott's racketeering activity under 18 U.S.C. § 1963(a)(3). Elliott has waived his right to a jury trial on the forfeiture issue. Elliott and the government agree on the amounts involved, but they disagree on which amounts should be included as proceeds. It is that question which we consider in this opinion.

### BACKGROUND

The seventy-count indictment charged that Elliott, a former partner in the law firm of Schiff, Hardin & Waite ("Schiff"), misused confidential client information for his personal benefit in nine sets of securities transactions. According to the government, when Elliott would learn confidential information about the planned acquisition of a large block of stock, he used this nonpublic information and purchased stock in the target company, in the expectation that the price would rise when the planned acquisition became public. The stock purchases were made through the Chicago office of Charles Schwab & Co. ("Schwab").

In connection with these stock transactions, the government charged Elliott with thirty-four counts of wire fraud, thirty-four counts of securities fraud, one count of filing a false tax return and, most importantly for this opinion, one count (Count 69) under RICO. Paragraph 3 of Count 69 charged that each of the nine sets of transactions in which Elliott illegally purchased stock was a racketeering act, and that the nine racketeering acts together constituted a pattern of racketeering activity, in violation of section 1962(c). In turn, paragraph 4 of Count 69 sought the forfeiture of the proceeds of the nine corresponding racketeering acts in paragraph 3.

At Elliott's request, we bifurcated the forfeiture proceedings for the guilt phase of the trial. After one mistrial, a jury convicted Elliott of all seventy counts charged in the indictment.

### Our Previous Decision

Before Elliott was found guilty, we dismissed five of the nine sections of Count

69's paragraph 4. *United States v. Elliott*, 714 F.Supp. 380 (N.D.Ill.1989). We based our dismissal on a consent decree in an earlier civil action by the Securities and Exchange Commission. In the consent decree, Elliott agreed to pay, without admitting or denying liability, a sum of $271,312, "representing disgorgement of profits allegedly derived from the securities transactions alleged in the complaint." The "securities transactions alleged in the complaint" essentially correspond to the acts included in Count 69 as racketeering acts 1, 4, 5, 6, 8 and 9. We concluded that the forfeiture claims associated with racketeering acts 4, 5, 6, 8 and 9 had to be dismissed because they sought to disgorge what had already been disgorged. We concluded that the forfeiture claim associated with racketeering act 1 should not be dismissed, because Elliott had paid only $66,250 to the SEC, while the government claimed that Elliott's proceeds from racketeering act 1 amounted to $112,562.50. We will, however, deduct $66,250 from what we determine to be the proceeds from racketeering act 1.

## DISCUSSION

In relevant part, section 1963(a)(3) provides:

Whoever violates any provision of section 1962 of this chapter ... shall forfeit to the United States, irrespective of any provision of State law—

\*       \*       \*       \*       \*       \*

(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity ... in violation of section 1962.

The government contends that Elliott received proceeds of $113,562.50 for racketeering act 1, $118,899.41 for racketeering act 2, $201,200.00 for racketeering act 3, and $4,125.00 for racketeering act 7. The government arrived at these figures by comparing the stock sales price to the purchase price for each transaction. Elliott concedes that the government's figures are correct if this particular method of calculation is used, but he argues that the method of calculation is faulty. In particular, he contends that three items should be deducted in determining the amount of proceeds: (1) the commissions paid to Schwab on the stock transactions; (2) the interest charged by Schwab on the margin loan used to purchase the securities; and (3) the income tax paid to the United States with respect to each of the transactions.

### Commissions and Interest

■ We will consider the commissions and interest first. The government argues that the plain meaning of the word "proceeds" supports its position. In the government's view, if Congress had intended to allow the deductions Elliott argues for, it would have used "profit" or "net profits," rather than the broader term "proceeds." While we would agree that "proceeds" is more inclusive than "profits," we do not think that the meaning of "proceeds" is plain. The lack of a plain meaning is apparent when one examines another body of law where "proceeds" figures prominently, namely, the Uniform Commercial Code. We note first that the UCC attaches a different meaning to the word than the one the government argues for here. Under section 9–306 of the Code, proceeds would include anything received from the disposition of a piece of collateral without a deduction for the price of the collateral. Here, the government concedes that the purchase price of the stock Elliott purchased must be deducted from the sale price. Moreover, even though the UCC, unlike the RICO statute, attempts to define "proceeds," the annotated version of the Code still lists a large number of cases where the meaning of "proceeds" is considered. *See* 3 Uniform Laws Annotated 449–53, Supp. 176–84. In light of this, we cannot say that the meaning of "proceeds" is plain.

Since the statute is not clear on its face, recourse to its legislative history is appropriate. Both Elliott and the government rely on the same passage from the Senate report:

In paragraph (3), the term "proceeds" has been used in lieu of the term "profits" in order to alleviate the unreasonable burden on the government proving net

profits. It should not be necessary for the prosecutor to prove what the defendant's overhead expenses were.

S.Rep. No. 225, 98th Cong., 2d Sess. 199 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3382. Based on this passage, both Elliott and the government seem to agree that while direct costs should be deducted from the amount of proceeds, overhead or indirect costs should not be. Unfortunately, this does not advance the argument very far; Elliott argues that the commissions and interest are direct costs, while the government replies that they are merely overhead.

Although the issue is a close one, we conclude that Elliott makes the better argument based on legislative history. Overhead is defined as "[a]ny cost not specifically or directly associated with the production of identifiable goods and services," *Black's Law Dictionary* 995 (5th ed.1979), and the commissions and interest do not fit into this definition. Rather, they were costs specifically associated with the money that Elliott made; indeed, Elliott could not have made the money he did without paying the commission and interest fees. Moreover, the commission and interest were money that Elliott never received. The Seventh Circuit has stated, in discussing an earlier version of the RICO forfeiture provision, that "[i]n order to truly separate the racketeer from his dishonest gains, ... [RICO] requires him to forfeit to the United States the total amount of the proceeds of his racketeering activity, regardless of whether the specific dollars received from that activity are still in his possession." This is because "[e]very dollar that the racketeer derives from illicit activities and then spends on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for him to spend for these purposes." *United States v. Ginsburg*, 773 F.2d 798, 802 (7th Cir.1985) (*en banc*), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986). Here, however, Elliott never received the money represented by the commissions and interest, and thus never had it available to spend on food or charity. Accordingly, we conclude that the amount of commissions and interest should not be included in the proceeds that Elliott must forfeit.

*United States v. Lizza Industries, Inc.*, 775 F.2d 492 (2d Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986), relied on by the government, does not require a contrary result. In that case, the conspirators had colluded on the bidding of four publicly-funded highway repair contracts. The district court ruled that "the defendants could deduct direct costs incurred on each project for which they had been indicted, but could not deduct general overhead and business expenses that otherwise would have been incurred in the operation of their business." *Lizza*, 775 F.2d at 495. On appeal, the Second Circuit upheld the district court's ruling and concluded that neither the overhead nor the taxes paid on the profits should be deducted. Essentially, the court held that while the cost of cement used on a particular project could be deducted, the prorated cost of a cement mixer, which might be used on other projects, could not be. We believe that the commissions and interest costs incurred by Elliott are closer to cement than to a cement mixer, because these costs only applied to particular transactions, not to the overall cost of running his scheme.

*Taxes*

■ By contrast, we conclude that the money Elliott paid in taxes should not be deducted from the amount of proceeds. Elliott did receive this money, and had the use of it before he had to pay it over to the government. Moreover, the amount of taxes Elliott had to pay in the years in question depended in part on his other, legitimate income and on the other investments he made that affected his deductions and the like. Thus, taxes are more like overhead—which the legislative history indicates should not be deducted—than like a direct cost of the transaction.

Elliott advances two reasons in support of deducting tax payments, but neither of them withstand scrutiny. First, he suggests that our earlier opinion, in which we held that the money paid to the SEC could

not be forfeited again, requires us to hold that the money paid to the IRS cannot be forfeited. We disagree. The money paid to the SEC was paid as a result of the stock transactions in question. The money paid to the IRS, by contrast, was paid in order to satisfy Elliott's duties as a citizen and to finance the costs of government. Accordingly, we need not treat the payments to the IRS the same as the payments to the SEC.

Second, Elliott contends that not to deduct the taxes would implicate equal protection concerns. According to Elliott, most RICO violators, such as drug dealers who receive their proceeds in cash, never report the proceeds as income and accordingly never pay taxes on them. Thus, these violators only have to pay the amount of the proceeds. On the other hand, Elliott, because he paid his taxes, will be required to pay both the proceeds and the taxes on those proceeds. Thus, unless we deduct the taxes paid, the RICO statute will have placed " 'an unequal hand on those who have committed intrinsically the same quality of offense.' " *McLaughlin v. Florida,* 379 U.S. 184, 194, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964) (quoting *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942)); *see also Lizza,* 775 F.2d at 499 (Van Graafieland, J., dissenting in part).

This argument is equally unavailing, because the government could tax the proceeds of Elliott's hypothetical drug dealer. In *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), the Supreme Court held that a convicted embezzler had to pay taxes on the embezzled funds, even though he had a duty to pay restitution to the victim. Although we have found no cases in which this principle has been applied to defendants convicted of drug-related RICO offenses, we can discern no reason why it should not. Accordingly, the premise of Elliott's unequal treatment argument fails. We therefore conclude that the taxes Elliott paid need not be

deducted from the proceeds he must forfeit.[1]

## FINDINGS OF FACT

Based on the legal principles set out above, we make the following findings of fact.

### Racketeering Act 1

We find that the difference in the purchase price and the selling price in the stock transactions in racketeering act 1 amounted to $113,562.50, that the commissions paid on these transactions amounted to $2,193.12, and that the interest amounted to $2,157.87. Therefore, the amount of proceeds equals $109,211.51. Pursuant to our previous order, we will deduct $66,-250.00 from this amount, for the money paid to the SEC, for a total of $42,961.51. We will enter judgment on that amount.

### Racketeering Act 2

We find that the difference in the purchase price and the selling price in the stock transactions in racketeering act 2 amounted to $118,899.41, that the commissions paid on these transactions amounted to $814.16, and that the interest amounted to $674.30. Therefore, the amount of proceeds equals $117,410.95, and we will enter judgment on that amount.

### Racketeering Act 3

We find that the difference in the purchase price and the selling price in the stock transactions in racketeering act 3 amounted to $201,200.00, that the commissions paid on these transactions amounted to $9,063.15, and that the interest amounted to $3,600.25. Therefore, the amount of proceeds equals $188,536.60 and we will enter judgment on that amount.

### Racketeering Act 7

We find that the difference in the purchase price and the selling price in the stock transactions in racketeering act 7 amounted to $4,125.00 and that the commissions paid on these transactions amounted to $452.13. (There was no interest on these transactions.) Therefore, the

---

**1.** We note that the Second Circuit reached the same conclusion, albeit without real discussion of the issue, in *Lizza.*

amount of proceeds equals $3,672.87, and we will enter judgment on that amount.